1   Laurence M. Rosen (SBN 219683)
2   **THE ROSEN LAW FIRM, P.A.**
    355 South Grand Avenue, Suite 2450
3   Los Angeles, CA 90071
    Telephone: (213) 785-2610
4   Facsimile: (213) 226-4684
    Email: lrosen@rosenlegal.com
5
6   *Counsel for Plaintiff*

7            IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
8

9   JAYSEN STEVENSON, derivatively on          **Case No.**
10  behalf of CAREDX, INC.,
                                                DEMAND FOR JURY TRIAL
11              Plaintiff,
                                                **VERIFIED STOCKHOLDER**
12          v.                                  **DERIVATIVE COMPLAINT**

13  GEORGE BICKERSTAFF, FRED COHEN,
14  CHRISTINE COURNOYER, GRACE E.
    COLÓN, ANKUR DHINGRA, MICHAEL
15  D. GOLDBERG, WILLIAM HAGSTROM,
    PETER MAAG, REGINALD SEETO,
16  RALPH SNYDERMAN and HANNAH
    VALANTINE,
17
18              Defendants,

19          and

20
    CAREDX, INC.,
21
                Nominal Defendant.
22

23
24
25
26
27
28

Plaintiff Jaysen Stevenson ("Plaintiff"), by and through his undersigned attorneys, derivatively, and on behalf of nominal defendant CareDx, Inc. ("CareDx" or the Company"), brings this derivative action against defendants George Bickerstaff, Fred Cohen, Christine Cournoyer, Grace E. Colón, Ankur Dhingra, Michael D. Goldberg, William Hagstrom, Peter Maag, Reginald Seeto, Ralph Snyderman, and Hannah Valantine (collectively, the "Individual Defendants," and together with CareDx, Inc., the "Defendants") for breaches of fiduciary duties as directors and/or officers of CareDx and for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

The wrongdoing alleged herein has caused substantial damage to CareDx's reputation and has exposed CareDx to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged CareDx in the form of, among other things, a substantial decline in the Company's market capitalization and corresponding stock value.

As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Verified Shareholder Derivative Complaint

**NATURE OF THE ACTION**

1.      This action seeks to remedy wrongdoing committed by CareDx's directors and officers from February 24, 2021 through the present (the "Relevant Period").

2.      CareDx is a diagnostics company that provides services and products to the organ transplant recipient community, offering diagnostic testing services, products, and digital healthcare software for transplant patients and care providers. The information gathered through the Company's surveillance and tests purportedly enables clinicians to make treatment decisions in the event of signs of organ rejection.

3.      During the Relevant Period, testing services for kidney and heart transplant recipients represented at least 85% of the Company's total revenues. This has been the case since at least the beginning of 2020. The Company's AlloSure® blood test for transplant recipients was, and is, the Company's primary source of revenue.

4.      For testing services, the Company receives a higher payment from Medicare reimbursements than from commercial payers. Therefore, the number of tests for which the Company was able to get Medicare reimbursement correlated with the Company's comparably higher average sales price ("ASP") for testing services. ASP was not specifically reported, but investors were able to calculate ASP by dividing testing service revenue by the number or volume of reported tests per financial period.

5.      For testing services, the Company receives a higher payment from Medicare reimbursements than from commercial payers. Therefore, the number of tests for which the Company was able to get Medicare reimbursement correlated with the Company's comparably higher ASP for testing services. The Company did not specifically report ASP, but investors

Verified Shareholder Derivative Complaint

were able to calculate ASP by dividing testing service revenue by the number or volume of reported tests per financial period.

6.      Seeto and the other Individual Defendants also emphasized to investors the success of the Company's RemoTraC service, an at-home blood draw service that the Company launched in response to the Covid-19 pandemic. The Company told the public throughout the Relevant Period that the RemoTraC service was a massive success that gave the Company the ability to "drive margins" for testing services.

7.      During the Relevant Period, the Individual Defendants caused the Company to issue materially false and misleading statements regarding testing services. Specifically, the Individual Defendants failed to disclose that certain CareDx officers had engaged in a number of improper and illegal schemes to inflate testing services revenue, including: (i) pushing protocols for surveillance of organ rejection through inaccurate marketing materials and in violation of Medicare standards; (ii) offering extravagant inducements or kickbacks to physicians and other providers; and (iii) improperly bundling expensive testing services with other blood tests as part of the RemoTraC service. As a result of this misconduct, CareDx would be subject to an undisclosed risk of regulatory scrutiny and the Company's testing services revenue and demand reported throughout the Relevant Period was artificially inflated. As a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and/or omitted material facts necessary to make those statements not false and misleading.

8.      On October 28, 2021, the truth began to emerge when CareDx filed its quarterly report for the third quarter of 2021. Under the heading "United States Department of Justice and United States Securities and Exchange Commission Investigation," the Company revealed for

the first time that CareDx was the subject of at least three government investigations. Specifically, the Company had received: (1) a civil investigative demand ("CID") from the U.S. Department of Justice ("DOJ") requesting the Company produce documents in connection with the DOJ's False Claims Act investigation; (2) a subpoena from the SEC in relation to an of matters similar to those identified in the CID and certain accounting and public reporting practices; and (3) an information request from an unnamed state regulatory agency (collectively the "Government Investigations").

9. On this news, the Company's stock price declined from $70.34 per share on October 28, 2021 to $51 per share on October 29, 2021. The stock continued to decline over the next week reaching $47.04 per share on November 5, 2021. This represented a 33% decline from the closing price on October 28, 2021.

10. The Company did not further comment on the status of the Government Investigations for several months. But investors learned more about the extent of the Company's misconduct and the nature of the Government Investigations on April 15, 2022, when the Company's former Head of Community Nephrology, Dr. Michael Olymbios, filed a complaint in California Superior Court that provided details regarding: (1) misconduct, including the use of RemoTraC to improperly bundle the Company's most expensive testing services, including AlloSure, with other blood tests, that led to the Government Investigations; (2) Defendant Peter Maag's ("Maag"), the former CEO and current director on the Company's Board, and Seeto's knowledge of the misconduct throughout the Relevant Period; and (3) their attempts to conceal the misconduct.

11.     On this news, the Company's stock price fell to $35.41 per share on April 14, 2022 and continued to fall the next trading day reaching $32.55 per share, a 14% decrease from the closing price of $38.02 on April 13, 2022.

12.     On May 5, 2022, the Company announced its results for the first quarter of 2022. The disclosure reported that testing service revenue fell well short of analysts' expectations and there was a 4.9% decline in ASP versus the last quarter of 2021.

13.     On this news, the stock price fell to $25.78 on May 6, 2022 and continued to fall the following trading day descending to $22.46, a 29% drop from the closing price on May 5, 2022.

14.     The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact. Further, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

15.     As detailed herein, and as alleged in the ongoing federal securities class action in the Northern District of California styled *Plumbers & Pipefitters Local Union #295 Pension Fund v. Caredx, Inc. et al.*, Case No. 3:22-cv-03023, (the "Federal Securities Class Action"), CareDx's officers and directors substantially damaged the Company by making false and misleading statements that omitted material adverse facts concerning the Company's worsening business prospects.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C.

§78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and raise a federal question pertaining to the claims made in the Federal Securities Class Action based on violations of the Exchange Act. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that would not otherwise have such jurisdiction.

18.     Venue is proper in this District because the Company is headquartered in this District and the Individual Defendants have been involved in business in this District. Further, Defendants' actions have had an effect in this district.

<u>**PARTIES**</u>

**Plaintiff**

19.     Plaintiff Stevenson is and has continuously been a stockholder of CareDx during the wrongdoing complained of herein.

**Nominal Defendant**

20.     Nominal Defendant CareDx is a Delaware corporation with its principal executive offices at 8000 Marina Boulevard, Brisbane, California 94005. CareDx's shares trade on the NASDAQ exchange under the symbol "CDNA."

**INDIVIDUAL DEFENDANTS**

**Defendant Bickerstaff**

21.     Defendant George Bickerstaff ("Bickerstaff") has served as a Company director since April 2014. He has served as Chair of the Audit Committee since the start of the Relevant Period. As of May 2, 2022, Defendant Cassidy owned 110,715 shares of the Company's common

Verified Shareholder Derivative Complaint

stock. At the close of trading on May 2, 2022, CareDx's stock price was $32.57 per share. Thus, Defendant Bickerstaff owned approximately $3,605,987.55 worth of CareDx stock.

22.     Defendant Bickerstaff also engaged in insider trading during the Relevant Period, netting proceeds in excess of nearly $2.4 million. His insider sales are as follows:

- On May 12, 2021, Defendant Bickerstaff sold 10,000 shares at an average price per share of $63.39 for net proceeds of $630,746.94;

- On May 21, 2021, Defendant Bickerstaff sold 10,000 shares at an average price per share of $75.63 for net proceeds of $753,373.47;

- On February 28, 2022, Defendant Bickerstaff sold 25,000 shares at an average price per share of $39.11 for net proceeds of $977,672.50.

**Defendant Cohen**

23.     Defendant Fred Cohen ("Cohen") has served as a Company director since 2003. As of May 2, 2022, Defendant Cohen owned 179,999 shares of the Company's common stock. At the close of trading on May 2, 2022, the price of CareDx stock was $32.57 per share. Thus, Defendant Cohen owned approximately$5,862,567.43 worth of CareDx stock.

**Defendant Cournoyer**

24.     Defendant Christine Cournoyer ("Cournoyer") has served as a Company Director since 2019. She has served as a member of the Audit Committee since the start of the Relevant period. As of May 2, 2022, Defendant Cournoyer owned 29,798 shares of the Company's common stock. At the close of trading on May 2, 2022, the price of CareDx stock was $32.57. Thus, Defendant Cournoyer owned approximately $970,520.86 worth of CareDx stock.

**Defendant Colón**

25.     Defendant Grace E. Colón ("Colón") has served as a Company Director since 2019. As of May 2, 2022, Defendant Colón owned 20,543 shares of the Company's common stock. At the close of trading on May 2, 2022, the price of CareDx stock was $32.57. Thus, Defendant Colón owned approximately $669,085.51 worth of CareDx common stock.

26.     Defendant Colón also engaged in insider trading during the Relevant Period, netting proceeds in excess of $48,000. Her insider sale is as follows:

- On March 9, 2022, Defendant Colón sold 1,393 shares at an average price per share of $34.56 for net proceeds of $48,146.12.

**Defendant Dhingra**

27.     Defendant Ankur Dhingra ("Dhingra") served as the Company's Chief Financial Officer from March 15, 2021 through May 25, 2022. As of May 2, 2022, Defendant Dhingra owned 41,896 shares of the Company's common stock. At the close of trading on May 2, 2022, the price of CareDx stock was $32.57. Thus, Defendant Dhingra owned approximately $1,364,552.72 worth of CareDx stock.

**Defendant Goldberg**

28.     Defendant Michael D. Goldberg ("Goldberg") has served as a Company director since November 2011 and as the Chairman of the Board since November 2021. He has served as a member of the Audit Committee since the start of the relevant period. As of May 2, 2022, Defendant Goldberg owned 229,545 shares of the Company's common stock. At the close of trading on May 2, 2022, the price of CareDx stock was $32.57 per share. Thus, Defendant Goldberg owned approximately $7,476,280.65 worth of CareDx stock.

29.     Defendant Goldberg also engaged in insider trading during the Relevant Period, netting proceeds of $4,488,933.86. His insider sales are as follows:

- On May 10, 2021, Defendant Goldberg sold 15,442 shares at an average price per share of $68.59 per share for net proceeds of $1,064,561.41.

- On May 11, 2021, Defendant Goldberg sold 49,083 shares at an average price of $66.99 per share for net proceeds of $3,268,971.80.

- On October 11, 2021, Defendant Goldberg sold 500 shares at an average price of $62.50 per share for net proceeds of $31,250.00.

- On November 9, 2021, Defendant Goldberg sold 500 shares at an average price of $47.54 per share for net proceeds of $23,770.00.

- On December 9, 2021, Defendant Goldberg sold 500 shares at an average price of $45.41 per share for net proceeds of $22,705.25.

- On January 10, 2022, Defendant Goldberg sold 500 shares at an average price of $42.97 per share for net proceeds of $21,485.00.

- On February 9, 2022, Defendant Goldberg sold 500 shares at an average price of $42.96 per share for net proceeds of $21,480.00.

- On March 9, 2022, Defendant Goldberg sold 500 shares at an average price of $33.41 per share for net proceeds of $16,704.00.

- On April 11, 2022, Defendant Goldberg sold 500 shares at an average price of $36.01 per share for net proceeds of $18,006.40.

**Defendant Hagstrom**

30.    Defendant William Hagstrom ("Hagstrom") has served as a Company director since 2015. He has served as a member of the Audit Committee since the start of the Relevant Period. As of May 2, 2022, Defendant Hagstrom owned 91,695 shares of the Company's common stock. At the close of trading on May 2, 2022, the price of CareDx stock was $32.57

per share. Thus, Defendant Hagstrom owned approximately $2,986,506.15 worth of CareDx stock.

31.     Defendant Hagstrom also engaged in insider trading during the Relevant Period, netting proceeds of $1,109,590.08. His insider trades are as follows:

- On May 14, 2021, Defendant Hagstrom sold 10,000 shares at an average price per share of $67.06 for net proceeds of $668,884.08

- On June 9, 2021, Defendant Hagstrom sold 5,000 shares at an average price per share of $88.14 for net proceeds of $440,706.00.

**Defendant Maag**

32.     Defendant Peter Maag ("Maag") has served as a Company director since 2012 and as Executive Chair from November 2020 until 2021. He was the Company's CEO from October 2012 to November 2020. Prior to that, he served as President from October 2012 through November 2018. As of May 2, 2022, Defendant Maag owned 1,180,121 shares of the Company's common stock. At the close of trading on May 2, 2022, CareDx's stock price was $32.57 per share. Thus, Defendant Maag owned approximately $38,436,541 worth of CareDx stock.

33.     Defendant Maag also engaged in insider trading during the Relevant Period, netting proceeds of $21,189,392.39. His insider trades are as follows:

- On March 5, 2021, Defendant Maag sold 10,000 shares at an average price per share of $62.05 for net proceeds of $612,850.96.

- On April 5, 2021, Defendant Maag sold 10,000 shares at an average price per share of $72.15 for net proceeds of $724,015.43.

- On May 3, 2021, Defendant Maag sold 20,000 shares at an average price per share of $76.96 for net proceeds of $1,532,722.77.

Verified Shareholder Derivative Complaint

- On May 5, 2021, Defendant Maag sold 10,000 shares at an average price per share of $73.48 for net proceeds of $733,191.89.

- On May 10, 2021, Defendant Maag sold 26,293 shares at an average price per share of $68.58 for net proceeds of $1,812,623.36.

- On May 11, 2021, Defendant Maag sold 87,128 shares at an average price per share of $66.99 for net proceeds of $5,802,799.21.

- On May 25, 2021, Defendant Maag sold 10,000 shares at an average price per share of $80.82 for net proceeds of $805,870.84.

- On June 7, 2021, Defendant Maag sold 26,500 shares at an average price per share of $87.52 for net proceeds of $2,285,752.20.

- On June 8, 2021, Defendant Maag sold 978 shares at an average price per share of $90.05 for net proceeds of $88,073.69.

- On June 9, 2021, Defendant Maag sold 2,522 shares at an average price per share of $90.00, for net proceeds of $226,981.51.

- On June 24, 2021, Defendant Maag sold 9605 shares at an average price per share of $95.30, for net proceeds of $915,397.80.

- On June 25, 2021, Defendant Maag sold 395 shares at an average price per share of $95.00, for net proceeds of $37,525.00.

- On July 6, 2021, Defendant Maag sold 10,000 shares at an average price per share of $90.42, for net proceeds of $907,002.19.

- On August 5, 2021, Defendant Maag sold 10,000 shares at an average price per share of $83.04, for net proceeds of $831,312.94.

Verified Shareholder Derivative Complaint

- On September 7, 2021, Defendant Maag sold 10,000 shares at an average price per share of $74.40, for net proceeds of $736,762.58.

- On October 5, 2021, Defendant Maag sold 10,000 shares at an average price per share of $65.02, for net proceeds of $646,729.45.

- On November 5, 2021, Defendant Maag sold 10,000 shares at an average price per share of $49.40, for net proceeds of $494,000.00.

- On December 6, 2021, Defendant Maag sold 10,000 shares at an average price per share of $42.04, for net proceeds of $416,189.87.

- On January 5, 2022, Defendant Maag sold 10,000 shares at an average price per share of $44.71, for net proceeds of $444,465.55.

- On February 7, 2022, Defendant Maag sold 10,000 shares at an average price per share of $42.06, for net proceeds of $420,668.28.

- On March 7, 2022, Defendant Maag sold 10,000 shares at an average price per share of $33.20, for net proceeds of $328,062.55.

- On April 5, 2022, Defendant Maag sold 10,000 shares at an average price per share of $38.91, for net proceeds of $386,394.32.

**Reginald Seeto**

34.    Defendant Seeto has served as CEO since November 2020. He has also served as President since November 2018. As of May 2, 2022, Defendant Seeto owned 350,293 shares of the Company's common stock. At the close of trading on May 2, 2022, CareDx's stock price was $32.57 per share. Thus, Defendant Seeto owned approximately $11,409,043 worth of CareDx stock.

35.     Defendant Seeto also engaged in insider trading during the Relevant period, netting proceeds of $7,994,719.44. His insider sales are as follows:

- On March 1, 2021, Defendant Seeto sold 10,704 shares at an average price per share of $84.46, for net proceeds of $914,700.48.

- On June 7, 2021, Defendant Seeto sold 9,973 shares at an average price per share of $90.01, for net proceeds of $897,643.80.

- On June 8, 2021, Defendant Seeto sold 500 shares at an average price per share of $90.00, for net proceeds of $45,001.00.

- On June 9, 2021, Defendant Seeto sold 16,718 shares at an average price per share of $90.01, for net proceeds of $1,504,818.94.

- On June 24, 2021, Defendant Seeto sold 10,602 shares at an average price per share of $95.31, for net proceeds of $1,010,513.73.

- On June 25, 2021, Defendant Seeto sold 9,210 shares at an average price per share of $95.15, for net proceeds of $876,317.69.

- On June 28, 2021, Defendant Seeto sold 13,212 shares at an average price per share of $95.88, for net proceeds of $1,264,990.34.

- On July 8, 2021, Defendant Seeto sold 5,994 shares at an average price per share of $85.74, for net proceeds of $513,503.31.

- On August 27, 2021, Defendant Seeto sold 658 shares at an average price per share of $80.00, for net proceeds of $52,640.00.

- On January 18, 2022, Defendant Seeto sold 1,719 shares at an average price per share of $40.07, for net proceeds of $68,880.85.

Verified Shareholder Derivative Complaint

- On January 19, 2022, Defendant Seeto sold 3,137 shares at an average price per share of $40.05, for net proceeds of $125,633.71.

- On February 1, 2022, Defendant Seeto sold 814 shares at an average price per share of $42.13, for net proceeds of $34,293.82.

- On February 2, 2022, Defendant Seeto sold 3,182 shares at an average price per share of $41.25, for net proceeds of $131,257.50.

- On February 4, 2022, Defendant Seeto sold 4,988 shares at an average price per share of $40.34, for net proceeds of $201,237.37.

- On February 9, 2022, Defendant Seeto sold 2,550 shares at an average price per share of $45.00, for net proceeds of $114,758.93.

- On March 1, 2022, Defendant Seeto sold 3,153 shares at an average price per share of $38.62, for net proceeds of $121,753.73.

- On March 21, 2022, Defendant Seeto sold 2,8888 shares at an average price per share of $40.43, for net proceeds of $116,774.26.

**Defendant Snyderman:**

36.     Defendant Ralph Snyderman ("Snyderman") served as a Company director from November 2005 through December 2022. As of May 2, 2022, Defendant Snyderman owned 151,397 shares of the Company's common stock. At the close of trading on May 2, 2022, CareDx's stock price was $32.57. Thus, Defendant Snyderman owned approximately $4,931,000.29 worth of CareDx stock.

37.     Defendant Snyderman also engaged in insider trading during the Relevant Period, netting proceeds of $761,848.87. His insider sales are as follows:

- On May 27, 2021, Defendant Snyderman sold 1,966 shares at an average price per share of $81.01, for net proceeds of $159,265.66.

- On May 28, 2021, Defendant Snyderman sold 2,511 shares at an average price per share of $81.08, for net proceeds of $203,594.64.

- On June 1, 2021, Defendant Snyderman sold 2,512 shares at an average price per share of $77.30, for net proceeds of $194,173.33.

- On June 2, 2021, Defendant Snyderman sold 2,511 shares at an average price per share of $81.57, for net proceeds of $204,815.24.

**Defendant Valantine**

38.     Defendant Hannah Valantine ("Valantine") has served as a Company director since July 1, 2021. As of May 2, 2022, Defendant Valantine owned 2,214 shares of the Company's common stock. At the close of trading on May 2, 2022, CareDx's stock price was $32.57. Thus, Defendant Valantine owned approximately $72,109.98 worth of CareDx stock.

39.     As a result of the aforementioned insider sales, Defendants Bickerstaff, Colón, Goldberg, Hagstrom, Maag, Seeto, and Snyderman avoided $25.5 million in losses. The loss calculations are based on a post-disclosure price of $22.46, the second consecutive trading day after the truth fully emerged.

40.     Collectively, Defendants Goldberg, Bickerstaff, Cournoyer, and Hagstrom, are referred to herein as the "Audit Committee Defendants."

41.     Collectively, Defendants Goldberg, Seeto, Bickerstaff, Cohen, Colon, Cournoyer, Hagstrom, Maag, Snyderman, Torres, and Valantine, are referred to herein as the "Individual Defendants."

Verified Shareholder Derivative Complaint

42.     The Individual Defendants, because of their positions with CareDx, possessed the power and authority to control the contents of CareDx's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

43.     CareDx offers various testing services for transplant patients, such as: a donor-derived cell-free DNA ("dd-cfDNA") blood test for kidney transplant patients called AlloSure® Kidney; a gene expression test for heart transplant patients known as AlloMap® Heart; and a dd-cfDNA test for heart transplant patients called AlloSure® Heart.

44.     The Company's revenues are reported in three segments: testing services, products, and patent and digital solutions. The testing services segment, which provides diagnostic surveillance testing services for solid organ transplant patients, accounted for 87% of the Company's 2021 revenue.

45.     AlloSure Kidney launched in 2017 and the Company has repeatedly stated that AlloSure Kidney "has received positive coverage decisions for reimbursement from Medicare," with a reimbursement rate of $2,841 per test. Indeed, the Company acknowledged that generating testing service revenue was dependent upon, among other things, the number of tests performed

on transplant patients and the establishment of coverage policies by third-party insurers and Medicare.

46.     The amount the Company could charge for testing services varied from payer to payer with the Company receiving its largest payments from Medicare reimbursement. Medicare reimbursement continued to play an outsized role in the Company's reported revenues and growth leading up to and during the Relevant Period. In the Form 10-K filed February 24, 2021 for the year ended December 31, 2020 (the "2020 10-K"), the Company reported that tests performed on patients covered by Medicare represented 48% of all CareDx tests in 2020, but accounted for 67% of all testing revenue from 2020 because Medicare reimbursement paid more than commercial payers.

47.     As a probable result of the Covid-19 pandemic, the Company reported a significant slowdown in testing services volume in early 2020. In response to the slowdown, CareDx launched RemoTraC, a home-based blood draw solution for immune-compromised transplant patients, in late March 2020. By early 2022, CareDx reported more than 11,000 kidney, heart, and lung transplant patients had enrolled to use RemoTraC.

**False and Misleading Statements Made by the Individual Defendants**

48.     On February 24, 2021, the Company announced its financial results for the fourth quarter and full year ended December 31, 2020. The press release announcing the results touted "record full-year revenue of $192.2 million, an increase of 51%" from the prior year and that testing services revenue for the quarter was $50.3 million, compared to $29.1 million in the same period of 2019. Defendant Seeto was quoted in the press release, stating "[o]ur record fourth quarter result was the culmination of an extraordinary year for CareDx." Seeto described 2020 as "transformational" due to the Company extending its "leadership position in transplant

centers through RemoTraC." 2021 guidance in the press release expected $255 million to $265 million in revenue.

49.     That same day, the Company filed with the SEC its yearly report on Form 10-K for the year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K stated, in relevant part:

> "*While we believe that we are currently in material compliance* with applicable laws and regulations relating to our LDTs, *we cannot be certain that the FDA or other regulatory agencies would agree with our determination*. A determination that we have violated these laws, or a public announcement that we are being investigated for possible violation of these laws, could hurt our business and our reputation."

(Emphasis added).

50.     The 2020 10-K did not disclose any present or impending claims alleging that the Company violated the federal False Claims Act. Rather, it stated "[o]ur future activities relating to billing, compliance with certain regulations and Medicare reimbursement requirements, physician and other healthcare provider financial relationships and the sale and marketing of our products may be subject to scrutiny under these laws." Defendants Seeto, Maag, Bickerstaff, Cohen, Colon, Cournoyer, Goldberg, Snyderman, and Hagstrom signed the 2020 10-K.

51.     Attached to the 2020 10-K was a certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Seeto, attesting that "the information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

52.     Later on the same day, Defendant Seeto, acting in his Company capacity, took part in an earnings call to discuss the fourth quarter and full year 2020 results. During the call, Defendant Seeto stated that "2020 was an exceptional year for CareDx as demand continued

unabated for our innovative first-in-class suite of high-value health care solutions for transplant patients and caregivers."

53.     Then, on May 5, 2021, the Company announced its financial results for the first quarter ended March 31, 2021. The press release announcing the results touted "strong start to 2021" and that the Company was raising full-year guidance for revenue to a range of $270 million to $280 million. The press release reported a 76% increase in total revenue year-over-year and testing services revenue of $59.3 million, compared to $31.4 million in the same period of 2020, an 88.8% increase year-over-year.

54.     That same day, the Company filed with the SEC its Form 10-Q for the period ended March 31, 2021 (the "1Q21 10-Q"). Seeto and Dhingra signed the 1Q21 10-Q and a certification pursuant to SOX attesting that "the information contained in the [10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company." The financial results from the May 5, 2021 were reiterated in the 1Q21 10-Q.

55.     That same day, Defendants Seeto and Dhingra, acting in their Company roles, took part in an earnings call discussing the Company's first quarter 2021 results. During the call, Seeto stated that he was "[r]eally excited about the testing services, which is growing well above the 50% range[.]" Regarding the revised guidance, Dhingra stated "[w]e are updating our 2021 revenue expectations to reflect our strong first quarter results and continued strong demand for our solutions." Regarding gross margins on testing services, Dhingra stated that "so on the margin side, we don't see any structural issues there[.]"

56.     On June 1, 2021, Seeto, acting in his Company role, attended the Company at the Jefferies Healthcare Conference. During the conference Seeto stated that in "the kidney space…it's an absolute winning formula" and emphasized that of the "1,000- plus community

nephrology practices, we have more than 100 now using AlloSure as part of that." Seeto further claimed that "there's just so much opportunity for us, overall testing services TAM."

57.     On June 8, 2021, Seeto and Dhingra, acting in their Company roles, attended the Goldman Sachs 42nd Annual Global Healthcare Conference. During the conference, Seeto stated, in relevant part:

> "I've been at a lot of companies that talked about patient first, patient centricity. ***And what I can say is CareDx actually lives and believes it. And it's just incredible. Every single town hall, we have these monthly starts off with the patient. As we look at every single one of our presentations, it starts off with the patient***. If we think of who we hire, everyone has a connection to the patient."

> (Emphasis added).

58.     On July 29, 2021, the Company announced its second quarter 2021 financial results for the period ended June 30, 2021. The press release announced revenue growth of 77% year-over-year and again raised guidance for 2021's revenue to a range of $280 million to $290 million. The press release also announced testing services revenues of $64.9 million, compared with $36.3 million in the same period of 2020, a 78% year-over-year increase.

59.     That same day, the Company filed with the SEC its Form 10-Q for the period ended June 30, 2021 (the "2Q21 10-Q"). The 10-Q reiterated the financial results in the press release. Seeto and Dhingra signed the 10-Q and a certification pursuant to SOX attesting that "the information contained in the [10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

60.     Also on that same day, Seeto and Dhingra, acting in their Company roles, took part in an earnings call to discuss the second quarter 2021 results. Regarding the Company's testing services revenue, Seeto stated that "[t]he main driver of growth in the quarter was from our testing services revenue, which increased 79% to $64.9 million." Seeto also stated that

20

"[o]ur direct to center approach remains core to our strategy, where we are focused on building the moat through an expanded portfolio of offerings within the transplant centers and by increasing the number of AlloSure testing protocols." Dhingra stated that the basis of increased revenue guidance was a "continued strong demand for our testing services in the United States." He added that "[w]e see great demand for our services and continuation of very positive response from patients."

61.     The Individual Defendants made materially false and misleading statements and/or omissions designed to mislead the investing public. The Individual Defendants failed to disclose that: (1) certain CareDx officers had engaged in various improper and illegal schemes to inflate testing services revenue and demand, including pushing a surveillance protocol through inaccurate marketing materials, offering extravagant inducements or kickbacks to physicians and other providers, and improperly bundling expensive testing services with other blood tests as part of the RemoTraC service; (2) these practices, exposed the Company to an undisclosed risk of regulatory scrutiny and/or liability under the federal False Claims Act; (3) these practices rendered the Company's testing services revenue reported throughout the Relevant Period artificially inflated; and (4) as a result, Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading at all relevant times.

**THE TRUTH EMERGES**

62.     On October 28, 2021, the Company issued a press release announcing its third quarter 2021 results for the period ended September 30, 2021. The press release announced that the Company "[g]rew testing services volume 86% year-over-year," however, testing services revenue had only increased from $45.5 million to $66.5 million year-over-year, a 46% increase.

The Company again raised 2021 revenue guidance, this time to a range of $290 million to $293 million.

63.     That same day, Defendants Seeto and Dhingra, acting in their Company roles, took part in an earnings call to discuss the third quarter 2021 results. During the call, an analyst from Craig-Hallum asked Seeto and Dhingra to comment on the lower ASPs for testing service revenue the Company reported during the quarter and asked whether they had seen "any changes in Medicare billing practices[.]" Dhingra replied "any change in the billing practices? No, no change. We haven't observed anything on the Medicare billing practices."

64.     That same day, the Company filed with the SEC its form 10-Q for the period ended September 30, 2021 (the "3Q21 10-Q"). The 3Q21 10-Q disclosed that the Company had recently received a CID from the DOJ requesting documents for a False Claims Act investigation into the Company's kidney testing and phlebotomy services, that the Company also received a subpoena from the SEC in connection with a probe into similar matters being investigated by the DOJ and certain accounting and public reporting practices, and that an unnamed state regulatory agency had also sent an information request to the Company.

65.     Then, on October 29, 2021, in response to the numerous regulatory agency investigations, analysts at BTIG published a report about CareDx which stated that "[t]he fact that [the Company] is being investigated by three different entities, both federal and at the state level, is notable. Based on our experience, disclosures of these sort typically bear some degree of merit[.]" BTIG also cut its price target for the Company from $118 to $100, a 15% decrease.

66.     On this news, the Company's stock price dropped from a previous close of $70.34 per share to a closing price of $51 per share on October 29, 2021. The stock continued to decline

1   over the next week, eventually hitting a closing price of $47.04 per share on November 5, 2021.

2   This represented a 33% decline from the October 28, 2021 closing price of $70.34.

3        67.     Then, on April 15, 2022, Michael Olymbios, a medical doctor and the former

4   Head of Community Nephrology for CareDx, filed a complaint, styled as *Michael Olymbios v.*

5   *CareDx, Inc.*, Case No. 22-cv-01582, (the "Olymbios Complaint") in the California Superior

6   Court for San Mateo County alleging that the Company "engaged in an unlawful campaign-

7   bolstered by illegal inducements to physicians, misleading research, and recommendations for

8   clinically unsupported treatment-to pad its sales." Dr. Olymbios left the Company because of

9   these revelations and a "toxic company culture[.]"

10

11       68.     The Olymbios Complaint was predicated by an arbitration the Company initiated

12  against Dr. Olymbios before the Judicial Arbitration and Mediation Services ("JAMS"). Dr.

13  Olymbios' action is to recover attorneys' fees and costs in connection with the arbitration and to

14  "recover damages caused by CareDx's campaign of defamation against him."

15

16       69.     The Olymbios Complaint alleged that Dr. Olymbios "directly reported to Reginald

17  Seeto [. . ]," and outlined the Company's knowing use of various improper schemes to

18  obtain Medicare reimbursement. In particular, the Olymbios Complaint alleged that the

19  Company engaged in the following unlawful business practices:

20

21       •   promoting a "surveillance" protocol for Allosure through inaccurate marketing

22           materials;

23       •   offering improper and extravagant kickbacks to physicians and providers to

24           promote Allosure;

25       •   representing that CareDx did not bill patients for its tests;

26

27       •   organizing "clinical studies" that were funded with condition-free grants;

28

- bundling Allosure with other blood tests as part of a mobile phlebotomy service to induce physicians to order Allosure and

- offering "advisory boards" to physicians that, in actuality, are captive marketing presentations.

70.    Other witnesses have corroborated Dr. Olymbios' claims. Namely, a former Senior Medical Science Liaison, described how CareDx's sales management personnel took doctors on "booze" cruises, helicopter tours, and expensive vacations in order to convince them to purchase products from the Company. Further, the kickbacks to physicians included trips to Napa Valley where they would be chauffeured in limousines, and provided expensive meals at fine restaurants, among other improper benefits. As this witness has stated, it was common knowledge within the Company that these kickbacks were occurring.

71.    The Olymbios Complaint further states that "Dr. Olymbios discussed his concerns and those of other employees with more than ten other current or former CareDx employees, including Peter Maag, then the Chief Executive Officer for CareDx, and Reg Seeto, the current President and Chief Executive Officer of CareDx." However, the executives "brushed off his concerns or berated him for raising them in the first place," and "repeatedly ignored or actively quashed any internal concerns about its activity."

72.    According to the Olymbios Complaint, Seeto and Maag, among others, "took active measures to avoid creating a paper trail of their misconduct. CareDx extensively used personal phones for company work and would save sensitive communications for text messages, such as the above text exchanges."

73.    Specifically, the Olymbios Complaint alleged that Maag and Seeto communicated through applications such as WhatsApp and Signal so they could have "off-the record conversations and speak with candor about what they were actually doing. [Seeto] and/or [Maag] also told Dr.

Verified Shareholder Derivative Complaint

Olymbios that their reason for switching from WhatsApp to Signal was because of their belief that messages sent over Signal were not retrievable." Further, Defendant Maag reportedly warned Dr. Olymbios that "there were certain things that shouldn't be in writing."

74.    The Olymbios Complaint alleges that in or around July or August 2020, Dr. Olymbios wrote an email to Maag and others that CareDx "should put in a letter to a nephrology practice that CareDx never bills patients." In pertinent part, the Olymbios Complaint alleges that:

> "Maag called Dr. Olymbios soon after he sent that email and **said that he was calling because there were things he couldn't be associated with as the CEO**. **He also told Dr. Olymbios that there were certain things that shouldn't be put in writing, like saying that CareDx never billed patients, even if that's how CareDx operated**. Upon information and belief, based on this and other comments, **Maag knew that CareDx's practices and representations regarding payment for AlloSure, its primary test, were unlawful and that he needed to take steps to avoid written records of CareDx's unlawful activity**."

(Emphasis added).

75.    The Olymbios Complaint further alleges that during Dr. Olymbios' exit interview, he "told Marissa Dixon, the Vice President of Human Resources at CareDx, that he had concerns about compliance with Medicare billing requirements. He also noted that he had conversations with Danielle Scelfo, Vice President of Market Access and Health Policy at CareDx, about these issues."

76.    The Olymbios Complaint also alleges that the Company retaliated against Dr. Olymbios after he reported the Company's unlawful conduct to government agencies. Specifically, the Olymbios Complaint states that:

> "**CareDx realized the existential threat that Dr. Olymbios's reporting presented to the company's continued existence**. Upon information and belief, **CareDx then embarked on a frantic spree to smear Dr. Olymbios in a misguided and retaliatory attempt at damage control**. While Dr. Olymbios is not aware of all statements made, upon information and belief, **CareDx instructed employees to impugn Dr. Olymbios's professional credibility by making defamatory statements to physicians and other persons in the transplant space**."

(Emphasis added).

77.     On this news, CareDx stock fell to $35.41 per share on April 14, 2022, and then to $32.55 per share on April 15, 2022, a 14% decrease from the closing price of $38.02 on April 13, 2022.

78.     The truth fully emerged on May 5, 2022, when the Company announced its financial results for the quarter ended March 31, 2022, the first quarter after it disclosed the aforementioned investigations into its misconduct. The Company reported a material average sales price ("ASP") decline for the price of its testing services.

79.     That same day, Defendants Seeto and Dhingra, acting in their Company roles, took part in an earnings call to discuss the first quarter 2022 results. During the call, Dhingra conceded the ongoing impact of the misconduct, stating that "[t]his aggregate average price, declined by about 4.9% versus last quarter of 2021."

80.     An analyst then inquired:

> "*It was another big deterioration in price this quarter*. We know there's going to be some Medicare Advantage changes ahead of flush through, but I would say that's pretty change quarter-over-quarter. *So what particularly new happened in Q1 to reduce that accruals for tests? And I guess, when do we reach a point where the ASP declines are going to stabilize and we can start to see them reverse*?"

(Emphasis added).

81.     To this question, Defendant Dhingra responded, in part, "we are anticipating this decline to continue through this year[.]"

82.     As a result of this call, Raymond James lowered its price target of the Company's stock by $7. It also reported that "the key testing services bucked was nearly $5M shy of our view, landing at $66M."

83.     On May 6, 2022, Craig-Hallum also issued a report after the earnings call and

lowered its price target for the Company from $87 to $63. The report stated "ASPs were a miss and dragged the Testing Services down well below our number and only an acquisition within Digital/Other brought the whole business back even."

84.     On this news, the stock price fell to $25.78 on May 6, 2022 and continued to fall the following trading day descending to $22.46, a 29% drop from the closing price on May 5, 2022.

85.     In addition to the foregoing, the Individual Defendants caused the Company to issue a false and misleading proxy statement during the Relevant Period. Form DEF 14A filed with the SEC on April 30, 2021 (the "2021 Proxy"). [1]

86.     The 2021 Proxy recommended shareholders vote to elect Bickerstaff, Colon, and Snyderman. The 2021 Proxy stated that the Audit Committee is responsible for "reviewing the Company's guidelines and policies with respect to risk assessment and risk management, including risks relating to the Company's accounting matters, financial reporting, legal and regulatory compliance and general business risks and the steps taken by management to monitor and control these exposures[.]"

87.     The 2021 Proxy did not disclose, however, that (1) certain CareDx officers had engaged in a variety of improper and illegal schemes to inflate testing services revenue and demand, including pushing a surveillance protocol through inaccurate marketing materials, offering extravagant inducements or kickbacks to physicians and other providers, and improperly bundling expensive testing services with other blood tests as part of the RemoTraC service; (2)

---

[1] These proxy allegations are solely based on negligence. They are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they did not allege fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

Verified Shareholder Derivative Complaint

these practices, exposed the Company to an undisclosed risk of regulatory scrutiny and liability under the False Claims Act; (3) these practices rendered the Company's testing services revenue reported throughout the Relevant Period artificially inflated; and (4) as a result, Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading at all relevant times.

88.     Additionally, the 2021 Proxy contained an Audit Committee Report which was signed by the Audit Committee Defendants and stated the following, in relevant part:

> "The Audit Committee has reviewed and discussed the Company's audited consolidated financial statements with management and Deloitte & Touche LLP ("Deloitte"), the Company's independent registered public accounting firm. The Audit Committee has discussed with Deloitte the matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board and the SEC.
> The Audit Committee has received and reviewed the written disclosures and the letter from Deloitte required by the applicable requirements of the Public Company Accounting Oversight Board regarding Deloitte's communications with the Audit Committee concerning independence, and has discussed with Deloitte its independence.
> Based on the review and discussions referred to above,  the Audit Committee recommended to the Board of Directors that the Company's audited consolidated financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2020 for filing with the Securities and Exchange Commission."

89.     The 2021 Proxy was false and misleading because, while it assured investors that, it would keep stockholders informed and that the Audit Committee reviewed filings, including the 2020 10-K, that was not the case as revealed by the numerous investigations by the Government Investigations and the Olymbios Complaint. The revelation of existing investigations and Olymbios Complaint show that the Individual Defendants allowed both each other and the Company to issue false and materially misleading statements during the Relevant Period.

**FIDUCIARY DUTIES**

90.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owes CareDx and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage CareDx in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of CareDx and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

91.     Each Individual Defendant owed and owes the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

92.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of CareDx, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with CareDx, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

93.     To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

- ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational

information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

- conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

- remain informed as to how CareDx conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

- truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Business Conduct and Ethics**

94.     The Individual Defendants, as officers and/or directors of CareDx, were bound by the Company's Code of Business Conduct and Ethics. [2]

95.     The Company's Code of Business Conduct and Ethics required the following of the Individual Defendants, as well as other employees of the Company:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

---

[2] *See* CareDx Code of Business and Ethics, available at, https://s201.q4cdn.com/458786462/files/doc_downloads/gov-docs/2022/COMPLIANCE-022-Code-of-Business-Conduct-and-Ethics-(released-in-MC-6-2-2022).pdf

Verified Shareholder Derivative Complaint

- full, fair, accurate, timely and understandable disclosure in reports and documents we file with or submit to the U.S. Securities and Exchange Commission and in our other public communications;

- compliance with applicable laws, rules and regulations;

- the prompt internal reporting of violations of this Code;

- protection for persons reporting any behavior pursuant to this Code; and

- accountability for adherence to this Code.

96.   The Code of Business Conduct and Ethics unequivocally requires Company employees to comply with the law, warns potential violators of civil and criminal liability:

> "***You are responsible for complying with all laws, rules, regulations and regulatory orders applicable to the conduct of our business.*** In developing, implementing, and applying this Code and other applicable policies and procedures, the Company is guided by applicable industry guidance, including, the AdvaMed Code of Ethics in Interactions with Health Care Professionals, voluntary compliance guidance issued by the Department of Health and Human Services Office of the Inspector General (HHS-OIG), applicable provisions of the Federal Food Drug and Cosmetics Act, as well as regulations and guidance issued by the Food and Drug Administration (FDA) and the Federal Trade Commission…
>
> ***Violations of laws, rules, regulations and orders may subject you to individual criminal or civil liability, in addition to discipline by the Company. Violations may also subject the Company to civil or criminal liability or the loss of business***."

(Emphasis added).

97.     The Code of Business Conduct and Ethics also required, in part, that those Company employees tasked with public communications, use all reasonable efforts to make sure that those communications were accurate:

> "*Individuals involved in the preparation of public reports and communications must use all reasonable efforts to comply with our disclosure controls and procedures, which are designed to ensure full, fair, accurate, timely and understandable disclosure in our public reports and communications.*"

> "*If you believe that any disclosure is materially misleading or if you become aware of any material information that you believe should be disclosed to the public, it is your responsibility to bring this information to the attention of the Designated Legal Officer*. If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should notify the Audit Committee of the Board."

(Emphasis added).

98.     The Code of Business Conduct and Ethics required employees and directors to keep accurate business records (and in particular, financial records), and to follow specific guidelines for managing records:

> "[T]he Company expects you, regardless of whether you are otherwise required to be familiar with finance or accounting matters, *to use all reasonable efforts to ensure that every business record or report with which you deal is accurate, complete and reliable*."

32

> "The Company is required by local, state, federal, foreign and other applicable laws, rules and regulations to retain certain records and to follow specific guidelines in managing its records. ***Records include paper documents, email, compact discs, computer hard drives, floppy disks, microfiche, microfilm and all other recorded information, regardless of medium or characteristics. Civil and criminal penalties for failure to comply with such guidelines can be severe for employees, agents, contractors and the Company***."

(Emphasis added).

99.     The Code of Business Conduct and Ethics additionally required directors and employees to investigate and report violations.

100.     The Code of Business Conduct and Ethics, consistent with the securities laws of the United States and other statutes, prohibited employees from engaging in unlawful insider trading:

> "You may not directly or indirectly—through, for example, significant others, family members or controlled entities—buy or sell stocks or other securities of the Company or any other Company based on nonpublic information obtained from your work at the Company…
> ***Under U.S. securities laws, it is unlawful for any person who has "material" nonpublic information about a Company to trade in the stock or other securities of that Company or to disclose such information to others who may trade***. Material nonpublic information is information about a Company that is not known to the general public and that a typical investor would consider important in making a decision to buy, sell or hold securities. Violations of U.S. securities laws may result in civil and criminal penalties, including disgorgement of profits, civil judgments, fines and jail sentences."

(Emphasis added).

Verified Shareholder Derivative Complaint

101.    The Code of Business Conduct and Ethics enables CareDx to take disciplinary action against any employees or directors who violated the provisions of the Code of Business Conduct and Ethics.

102.    The Individual Defendants failed to adhere to the Code of Conduct when they failed to: comply with the law, conduct honest and ethical business practices, and disclose the truth regarding the Company's business practices. The Individual Defendants also failed to adhere to the Code of Conduct when they traded the Company's stock based at least in part on insider information and took proactive steps to make sure certain communications among themselves were not able to be maintained. Specifically, the use of certain messaging applications with the belief that messages sent through the applications were not retrievable.

### Duties Pursuant to CareDx's Audit Committee Charter

103.    In addition to these duties, the Audit Committee Defendants, who served on the Audit Committee during the Relevant Period, owed specific duties to CareDx under the Audit Committee Charter (the "Audit Charter"). [3] Specifically, the Audit Charter provided for the following responsibilities of the Audit Committee Defendants:

- Provide oversight of the Company's accounting and financial reporting processes and the audit of the Company's financial statements;

- Assist the Board in oversight of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditor's qualifications, independence and performance, (iv) the Company's internal accounting and financial controls, and

---

[3] *See* CareDx Audit Charter at:
https://s201.q4cdn.com/458786462/files/doc_downloads/gov-docs/CareDx-Audit-Committee-Charter.pdf.

(v) the organization and performance of the Company's internal audit function; and

- Provide to the Board such information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.

104.    Regarding review procedures, the Audit Committee Defendants are required to "Review[] and discuss[] with management…the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations,' prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q with the SEC[.]"

105.    The review procedures further require reviews of the Company's risk management policies.

106.    Regarding regulatory compliance, the Audit Committee Defendants' duties required the following:

- Reviewing and discussing with management and the Company's independent auditors, as appropriate, the Company's guidelines and policies with respect to risk assessment and risk management, including risks relating to the Company's accounting matters, financial reporting and legal and regulatory compliance and the steps taken by management to monitor and control these exposures;

- In conjunction with the Board, reviewing and discussing with management, as appropriate, general business risks, insurance programs, including director and officer insurance, product liability insurance and general liability insurance;

35

\*\*\*

- Overseeing compliance with the requirements of the SEC for disclosure of auditor's services and Audit Committee members, member qualifications and activities;

\*\*\*

- Providing a report for inclusion in the Company's proxy statement in accordance with the rules and regulations of the SEC; and

- Establishing procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

107. The Audit Committee Defendants failed to uphold their duties required by the Audit Charter by allowing the Company to issue materially false and misleading statements regarding the Company's compliance with federal and state law. Regarding the complaints and attempts by Dr. Olymbios to discuss his concerns, the Audit Committee Defendants failed to take appropriate action proscribed by the Audit Charter.

## **BREACHES OF DUTIES**

108. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of CareDx, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

109. The Audit Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the omission of material information, making the improper

statements detailed herein, and failing to properly oversee CareDx's public statements and internal control function.

110.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of CareDx, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, because of Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws, numerous investigations by regulatory agencies, and the Olymbios Complaint. As a result, CareDx has expended, and will continue to expend, significant sums of money.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

111.    Plaintiff brings this action derivatively and for the benefit of CareDx to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of CareDx, insider trading, waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the Exchange Act.

112.    CareDx is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

113.    Plaintiff is, and has been continuously at all relevant times, a stockholder of CareDx. Plaintiff will adequately and fairly represent the interests of CareDx in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

114.    Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

115.     A pre-suit demand on the Board of CareDx is futile and, therefore, excused. At the time of filing this action, the Board consists of Defendants Bickerstaff, Cohen, Colón, Cournoyer, Goldberg, Hagstrom, Maag, Seeto, and Valantine (the "Director Defendants"), and non-party Art Torres. Plaintiff needs only to allege demand futility as to a majority (six) of the ten Directors on the Board at the time this action is commenced.

**_Six of the Nine Director Defendants Received a Material Personal Benefit Through Insider Trading_**

116.     During the Relevant Period, the Company's stock price saw three drops of 33%, 14%, and 29%. When the truth fully emerged, the Company's stock price fell as low as $22.46 per share.

117.     From May 10, 2021 through April 11, 2022, Goldberg reaped $4.4 million from insider sales while the Company's stock price was artificially inflated. His sales ranged in prices from $33.41 to $68.59 per share.

118.     From March 1, 2021 through March 21, 2022, Seeto reaped $7.9 million from insider sales while the Company's stock price was artificially inflated. His sales ranged in prices from $38.62 to $95.88 per share. Seeto also personally made many of the materially false and misleading statements described herein that caused the stock price to become artificially inflated. Further, according to the Olymbios Complaint, he took affirmative steps to enable and help conceal the Company's unlawful conduct.

119.     From May 12, 2021 through February 28, 2022, Bickerstaff reaped $2.3 million from insider sales while the Company's stock price was artificially inflated. His sales ranged in prices from $39.11 to $75.63 per share.

120.    On March 9, 2022, Colón reaped $48,146 from insider sales while the JAMS matter with Dr. Olymbios was ongoing and less than a month before the Olymbios Complaint was filed. Colon's sales were made at $34.56 per share.

121.    From May 14, 2021 through June 9, 2021, Hagstrom reaped $1.1 million from insider sales while the Company's stock price was artificially inflated. His sales ranged in prices from $67.06 to $88.14 per share.

122.    From March 5, 2021 through April 5, 2022, Maag reaped $21.1 million from insider sales while the Company's stock price was artificially inflated. His sales ranged in prices from $33.20 to $95.30 per share. According to the Olymbios Complaint, he took affirmative steps to enable and help conceal the Company's unlawful conduct.

123.    Therefore, demand is as excused as futile as to Defendants Goldberg, Seeto, Bickerstaff, Colón, Hagstrom, and Maag because they all received a material personal benefit as a result of the misconduct that would be the subject of a litigation demand.

***All of the Director Defendants Face a Substantial Likelihood of Liability***

124.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme in which they engaged, knowingly or recklessly, to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

125.    In abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the

Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

126.     Director Defendants Seeto, Maag, Bickerstaff, Cohen, Colón, Cournoyer, Goldberg, and Hagstrom further face a substantial likelihood of liability because they signed and thus personally made the false and misleading statements in the 2020 10-K.

127.     Seeto signed a SOX certification to the 2020 10-K; May 5, 2021 10-Q; and July 29, 2021 10-Q. Seeto also personally made materially misleading statements during the earnings calls and conference described herein.

128.     As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For the above reasons, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

129.     Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Committee Charter, and allowed the Company to issue false and misleading financial statements with the SEC. Thus, the Audit

1   Committee Defendants breached their fiduciary duties, are not disinterested, and demand is

2   excused as to them.

3          130.    In violation of the Code of Conduct, the Director Defendants conducted little, if

4   any, oversight of the Company's engagement in the Individual Defendants' scheme to issue

5   materially false and misleading statements to the public and to facilitate and disguise the

6   Individual Defendants' violations of law, including insider trading, breaches of fiduciary duty,

7   waste of corporate assets, unjust enrichment, and violations of Sections 14(a) and 20(a) of the

8   Exchange Act. In further violation of the Code of Conduct, the Director Defendants failed to

9   comply with laws and regulations, maintain the accuracy of Company records and reports, avoid

10  conflicts of interest, conduct business in an honest and ethical manner, protect and properly use

11  corporate assets, and properly report violations of the Code of Conduct. Thus, the Director

12  Defendants face a substantial likelihood of liability and demand is futile as to them.

13         131.    CareDx has been and will continue to be exposed to significant losses due to the

14  wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits

15  against themselves or others who were responsible for that wrongful conduct to attempt to

16  recover for CareDx any part of the damages CareDx suffered and will continue to suffer thereby.

17  Thus, any demand upon the Director Defendants would be futile.

18         132.    The Individual Defendants' conduct described herein and summarized above

19  could not have been the product of legitimate business judgment as it was based on bad faith and

20  intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim

21  exculpation from their violations of duty pursuant to the Company's charter (to the extent such

22  a provision exists). As a majority of the Director Defendants face a substantial likelihood of

23  liability, they are self-interested in the transactions challenged herein and cannot be presumed to

be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

133.    The acts complained of herein constitute violations of fiduciary duties owed by CareDx's officers and directors, and these acts are incapable of ratification.

134.    Thus, for all the reasons set forth above, all the Director Defendants, and, if not all of them, at least a majority of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

### For Violations of Section 14(a) of the Exchange Act

### Against the Individual Defendants

135.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

136.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these non-fraud claims.

137.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].".

138.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

139.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for stockholder determination in the 2021 Proxy, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation on an advisory basis.

140.    The false and misleading elements of the 2021 Proxy led to the re-elections of Bickerstaff, Colon, and Snyderman to serve until the 2024 annual meeting, allowing them to continue breaching their fiduciary duties to CareDx.

141.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2021 Proxy.

142.    Plaintiff, on behalf of CareDx, has no adequate remedy at law.

## COUNT II

### Violations of Section 20(a) of the Exchange Act

### Against the Individual Defendants

Verified Shareholder Derivative Complaint

143.    Plaintiff incorporates all the foregoing by reference.

144.    The Individual Defendants, by virtue of their positions with CareDx and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of CareDx and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and exercised same, to cause CareDx to engage in the illegal conduct and practices complained of herein.

145.    Plaintiff, on behalf of CareDx, has no adequate remedy at law.

## COUNT III

### Breach of Fiduciary Duties

### Against Individual Defendants

146.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

147.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of CareDx's business and affairs.

148.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

149.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of CareDx.

150.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

Verified Shareholder Derivative Complaint

151.    Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements during the Relevant Period, that assured investors that CareDx was in regulatory compliance, yet failed to disclose major problems which included that: (1) Individual Defendants had engaged in a variety of improper and illegal schemes to inflate testing services revenue and demand, including pushing a surveillance protocol through inaccurate marketing materials, offering extravagant inducements or kickbacks to physicians and other providers, and improperly bundling expensive testing services with other blood tests as part of the RemoTraC service; (2) these practices, and others, subjected CareDx to an undisclosed risk of regulatory scrutiny and liability under the False Claims Act; (3) these practices rendered the Company's testing services revenue reported throughout the Relevant Period artificially inflated; and (4) as a result, Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading.

152.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

153.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed

45

knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

154.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

155.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, CareDx has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

156.    Plaintiff, on behalf of CareDx, has no adequate remedy at law.

## COUNT IV

### For Insider Trading

### Against Defendants Bickerstaff, Colón, Goldberg, Hagstrom, Mag, Seeto, and Snyderman

157.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

158.    When Defendants Goldberg, Seeto, Bickerstaff, Colon, Hagstrom, Maag, and Snyderman sold over $37.9 million worth of stock and avoided losses of $25.5 million, they were in possession of material, non-public information regarding the insiders' improper and illegal schemes to inflate testing services revenue, the public disclosure of which would have an adverse effect on the stock price. The revelation of this adverse information and the full truth concerning Defendants Seeto's and Maag's involvement in the scheme would destroy millions in market capitalization when revealed to the market.

159.    The foregoing information was proprietary, material, adverse, and non-public information regarding the Company's operations known only by CareDx insiders. The

information which formed the basis of the sales of stock made by Defendants Goldberg, Seeto, Bickerstaff, Colon, Hagstrom, Maag, and Snyderman was the type of information upon which they were specifically barred from trading. This information was a proprietary asset belonging to CareDx, which was usurped for the benefit of Defendants Goldberg, Seeto, Bickerstaff, Colon, Hagstrom, Maag, and Snyderman and to the detriment of the Company.

160.    The use of this information by Defendants Goldberg, Seeto, Bickerstaff, Colon, Hagstrom, Maag, and Snyderman was a breach of their fiduciary duty of loyalty. Their insider sales of stock during the Relevant Period were predicated upon their possession of material, adverse, non-public information to which they had access as CareDx insiders.

161.    Plaintiff, on behalf of CareDx, has no adequate remedy at law.

## COUNT V

### For Unjust Enrichment

### Against the Individual Defendants

162.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

163.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense and to the detriment of CareDx.

164.    The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from CareDx tied to the performance or artificially inflated valuation of CareDx, or received compensation that was unjust in light of the

Individual Defendants' bad faith conduct, or sold stock at artificially inflated prices during the Relevant Period.

165.    Under the circumstances it would be unjust and inequitable for the Individual Defendants to retain their ill-gotten gains.

166.    Plaintiff, on behalf of CareDx, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of CareDx, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached their fiduciary duties to CareDx;

(c)    Declaring that the Individual Defendants violated Sections 14(a) and 20(a) of the Exchange Act;

(d)    Declaring that the Individual Defendants were unjustly enriched;

(e)    Determining and awarding to CareDx the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

(f)    Directing CareDx and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect CareDx and its stockholders from a repeat of the damaging events described herein;

(g)    Awarding CareDx restitution from Individual Defendants

(h)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(i)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

**THE ROSEN LAW FIRM, P.A.**
/s/ Laurence M. Rosen
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

**<u>VERIFICATION</u>**

I, Jaysen Stevenson am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of __2/3/2023__, 2023.

Jaysen Stevenson